UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:15-cr-00124 KJM |
| Plaintiff, | ORDER |
| v. | |
| John Ortiz, | |
| Defendant. | |

Defendant John Ortiz moves for a reduction of his sentence under 18 U.S.C. § 3582(c)(1)(A). He argues his health conditions and placement put him at risk of severe illness from COVID-19, and provide "extraordinary and compelling reasons" to grant his request. The government opposes; it concedes he may have at least one medical condition sufficient for consideration under the statute, but argues the conditions at FCI Sheridan, the risk Mr. Ortiz poses to the community, and the § 3533 sentencing factors do not support a reduction in his sentence. The court submitted the motion without a hearing. For the following reasons, the court **grants** the motion.

I.  **BACKGROUND**

From 2014 to 2015, Mr. Ortiz shipped a number of packages that contained large amounts of methamphetamine from Hawaii from California. *See* Factual Basis at 1–3, Plea Agreement Ex. A, ECF No. 93. In June 2015 law enforcement authorities executed a federal search warrant

1

at Ortiz's residence and uncovered two firearms that belonged to Mr. Ortiz's father as well as plastic bags and globes containing residue consistent with methamphetamine. *Id.* at 3–4. After his arrest in 2015, Mr. Ortiz was released to the WellSpace facility to participate in its treatment program, which he completed successfully. Bail Review Min., ECF No. 30; Mot. at 1, ECF No. 274. Subsequently, Mr. Ortiz pled guilty to conspiracy and "possess with intent to distribute methamphetamine" in violation of 21 U.S.C. §§ 846 & 841(a)(1). J. & Commitment at 1, ECF No. 155; Plea Agreement at 6, ECF No. 93. The parties entered into a plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C), agreeing a sentence between eight and twelve years would be appropriate. Plea Agreement at 2. The court accepted the agreement and sentenced Mr. Ortiz to 120 months in prison and a 36-month term of supervised release. J. & Commitment at 2–3. The court recommended Mr. Ortiz be incarcerated in Taft, California to "facilitate visitation by his aging and infirm father" and fifteen-year-old daughter. *Id.* at 2. Ultimately, the Bureau of Prisons incarcerated Mr. Ortiz at FCI Sheridan in Sheridan, Oregon, where he is currently serving his custodial sentence. *See* Mot. at 2; Opp'n at 4, ECF No. 284.

Mr. Ortiz has been in continuous custody for approximately 45 months. *See* Mot. at 2; Opp'n at 4. Assuming the application of good time credits, Mr. Ortiz's projected release date is October 22, 2025. Opp'n at 4. Defense counsel argues the court should view the 45 months Mr. Ortiz has served as equivalent to half his actual sentence with the application of good time credits and the time off he would receive if he were allowed to complete the Bureau of Prison's 500 hour Residential Drug Treatment program known as RDAP, as the court recommended at the time of sentencing. Mot. at 2. The government posits instead that Mr. Ortiz has really only completed 38 percent of his sentence, as the court should consider his original 120-month sentence in making this calculation. Opp'n at 4.

Mr. Ortiz moves to reduce his custodial sentence to time served under 18 U.S.C. § 3582(c). *See generally* Mot., ECF No. 274. He argues his health conditions (64.4 body-mass index, asthma, hypertension, history of smoking) make him especially vulnerable to serious COVID-19 symptoms, and the crowded and unsanitary conditions at FCI Sheridan foster rapid spikes of COVID-19 cases. *See id.* at 5–9; *see also* Federal Public Defense Investigator Courtney

2

Withycombe Decl., Mot. Ex. D, ECF No. 274-1 (Withycombe Decl.). The government opposes the motion, arguing Mr. Ortiz's medical conditions may warrant consideration of compassionate release, but his potential to pose a danger to the community, his culpability for his conviction offense, and the modest portion of his sentence he has completed do not merit a reduction to time-served. *See generally* Opp'n. The matter is fully briefed, Reply, ECF No. 287, and was submitted without a hearing, Minute Order, ECF No. 281. Mr. Ortiz filed supplemental exhibits to his reply, ECF No. 288, asking the court to take notice of two attached exhibits. This court declines to do so.

## II.   LEGAL STANDARD

The district court that imposed a sentence on a criminal defendant has authority to modify the term of imprisonment under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018. Under the statute, a court may consider a defendant's motion to reduce his prison term if the defendant first satisfies an administrative exhaustion requirement. *Id.* §§ 3582(c)(1)(A). If a defendant has exhausted his administrative remedies, the analysis is twofold. First, the court must find "extraordinary and compelling reasons" to release a defendant from BOP custody. *Id.* § 3582(c)(1)(A)(i). Second, the court must consider the same factors that were applicable at the original sentencing, enumerated in 18 U.S.C. § 3553(a), to the extent they remain applicable at the time the motion is brought. *See id.* § 3582(c)(1)(A).

Section 3582 further requires "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A). In 2006, the Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and compelling reasons" to release a defendant from BOP custody, which was last amended November 1, 2018. *See* U.S.S.G. § 1B1.13. Since the passage of the First Step Act, district courts have disagreed whether U.S.S.G. § 1B1.13 remains binding. This court, as it has in previous cases, considers the Sentencing Commission's policy statement as guidance, without determining whether it is binding in this context. The court notes as relevant here that, in addition to listing possible "extraordinary and compelling reasons," section 1B1.13 "imposes an additional consideration of whether the defendant is a danger to the safety of any other person or to the

community." *United States v. Numann*, No. 16-00025, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing U.S.S.G. § 1B1.13(2)); *see also United States v. Arceneaux*, 830 F. App'x 859, 859 (9th Cir. 2020) (unpublished) (affirming denial of compassionate release because district court did not err in finding defendant would pose threat to community if released).

"Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate release brought pursuant to § 3582(c) as amended by the [First Step Act], district courts that have done so have agreed that the burden remains with the defendant." *United States v. Becerra*, No. 18-0080, 2021 WL 535432, at *3 (E.D. Cal. Feb. 12, 2021).

### III. ANALYSIS

The parties do not dispute that Mr. Ortiz has exhausted his administrative remedies as required by § 3582(c), Opp'n at 5. The court thus considers (A) whether Mr. Ortiz establishes that his motion is supported by extraordinary and compelling reasons and (B) whether applicable sentencing factors of § 3553(a) support his motion.

#### A. Extraordinary and Compelling Reasons

Many federal district courts, including this court, have fond that defendants can demonstrate "extraordinary and compelling reasons" for compassionate release under § 3582(c)(1)(A)(i) if they show (1) their health conditions put them at increased risk of severe COVID-19 symptoms and (2) they are at risk of infection because their facility is currently suffering from a COVID-19 outbreak or is at risk of an outbreak. *See, e.g.*, *United States v. Terraciano*, __ F. Supp. 3d __, No. 17-00187, 2020 WL 5878284, at *3–4 (E.D. Cal. Oct. 2, 2020). Recent or ongoing rises in the reported number of infections might make for a stronger showing of "extraordinary and compelling reasons," but spikes and outbreaks have not always been necessary to support motions under § 3582(c)(1)(A). *See id.* at *3.

Here, Mr. Ortiz's health conditions increase his risk of severe illness from COVID-19. His body mass index exceeding 60 places him well above the range CDC has found to be at higher risk of severe illness from COVID-19. *See* BOP Medical Records at 36, Ex. A, ECF No. 275 (noting his weight of 410 pounds); Appeal of Admin Denial, Ex. C, ECF No. 274 (describing

himself as "morbidly obese with a BMI over 40").[1]  At a height of 5 feet 6 inches, Presentencing Report (PSR) at 3, ECF No. 114, and a weight of 410 pounds, Mr. Ortiz' body mass index is 66.2, U.S. Centers for Disease Control, *Adult BMI Calculator* (updated Sept. 17, 2020).[2] *See also* U.S. Centers for Disease Control & Prevention, *People with Certain Medical Conditions* (March 3, 2021) ("Having . . . severe obesity (BMI > 40kg/m2 or above), increases your risk . . . of severe illness from COVID-19.").[3]  District courts within the Ninth Circuit have recognized obesity greatly increases the risk of serious COVID-19 complications and have granted motions for compassionate release to inmates with a body mass index lower than Mr. Ortiz's. *See, e.g.*, *United States v. Richardson*, No. 2:17-00048, 2020 WL 3402410, at *3 (E.D. Cal. June 19, 2020) (defendant with BMI of 38 qualified for compassionate release because "obesity alone" places a defendant "at higher risk of COVID-19 complications").  According to the government, Mr. Ortiz's body mass index renders him "technically eligible under the minimum threshold for consideration for compassionate release," but the government says FCI Sheridan is providing sufficient treatment for his health condition to overcome the risk.  Opp'n at 11.  The government does not point to any documentation of FCI Sheridan's treatment of Mr. Ortiz to address his health condition in the face of COVID-19.  The defense points to Mr. Ortiz's medical records, which identify a prior severe leg injury and persistent edema, both of which limit his mobility and make it difficult for Mr. Ortiz to exercise, especially within the confines of the institution.  Mot.

---

[1] The court grants both the defense and government requests to file Mr. Ortiz's medical records under seal to protect his private medical information.  Defense Req. to Seal, ECF No. 275; Gov't Req. to Seal, ECF No. 285. *See Chester v. King*, No. 16-01257, 2019 WL 5420213, at *2 (E.D. Cal. Sep. 10, 2019) ("This court, and others within the Ninth Circuit, have recognized that the need to protect medical privacy qualifies as a 'compelling reason' for sealing records.").

[2] https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html, last visited November 10, 2020.

[3] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  The court takes judicial notice of this information. *See, e.g.*, *Dubrin v. Cty. of San Bernardino*, No. 15-589, 2017 WL 8940181, at *21 n.14 (C.D. Cal. Sept. 7, 2017), *report and recommendation adopted*, 2017 WL 4339645 (C.D. Cal. Sept. 29, 2017) ("The Court may take judicial notice of the CDC information which is not subject to reasonable dispute, in part, because it is readily determined from a source the accuracy of which cannot reasonably be questioned (i.e., the CDC website).").

at 3–4; Medical Records at 36, Ex. A, ECF No. 275.[4]  Defense argues that "60 minutes . . . of moderate intensity activity is needed for meaningful weight loss" but due to the prison imposing quarantine necessitated restrictions on activity, Mr. Ortiz is unable to do this.  Mot. at 14.

In addition to his BMI, Mr. Ortiz suffers from other health conditions increasing his risks of contracting severe illness if infected with COVID-19.  Specifically, Mr. Ortiz has had asthma since childhood and has been diagnosed with hypertension, as reported in both his PSR and BOP medical records; he also has a history of smoking marijuana.  Mot. at 4–5, 14*; see generally,* Medical Records.  In response to these medical conditions, the government argues that Mr. Ortiz's medical records indicate he is being treated, that his asthma is not severe enough to pose an increased risk of COVID-19 complications, and marijuana cigarette use is not currently recognized as a risk factor by the CDC.  Opp'n at 10–11.  The government is correct that marijuana use is not explicitly recognized by the CDC as a risk factor, but the CDC has observed that "[t]he use of drugs by smoking . . . (e.g., . . . marijuana) can make . . . asthma, and other lung conditions worse. . . For these reasons, it is possible that drug use could make COVID-19 illness more severe. . . ."  CDC, *Are patients Who Use Drugs or Who have Substance Use Disorder at Higher Risk for COVID-19 Infection* (last visited March 11, 2020).[5]

Mr. Ortiz has provided evidence of medical conditions overall that demonstrate he is at higher risk of becoming seriously ill if he contracts COVID-19.  While the medical records do not clarify the severity of Mr. Ortiz's asthma, recording only that he has "asthma-current," he has signed a declaration under penalty of perjury saying that he uses his albuterol inhaler three times a day.  Ortiz Decl., Reply Ex. A., ECF No. 287-1.  Similar combinations of asthma, however severe, and obesity have supported compassionate release in other cases.  *See, e.g.*, *United States v. Miles*, No. 2:17-cr-00127-KJM, 2020 U.S. Dist. LEXIS 242283, at *4 (E.D. Cal. Dec. 23,

---

[4] The court grants both the defense and government's requests to file Mr. Ortiz's medical records under seal to protect his private medical information.  Defense Req. to Seal, ECF No. 275; Gov't Req. to Seal, ECF No. 285.  *See Chester v. King*, No. 16-01257, 2019 WL 5420213, at *2 (E.D. Cal. Sep. 10, 2019) ("This court, and others within the Ninth Circuit, have recognized that the need to protect medical privacy qualifies as a 'compelling reason' for sealing records.").

[5] https://search.cdc.gov/search/index.html?query=marijuana+&sitelimit=coronavirus%2F2019-ncov&utf8=%E2%9C%93&affiliate=cdc-main

2020) (granting compassionate release to a defendant with non-moderate or severe asthma and obesity); *United States v. Rodriguez*, 476 F. Supp. 3d 1071, 1074–76 (S.D. Cal. 2020) (granting motion for compassionate release for defendant suffering from "chronic" asthma, obesity, and major depressive disorder; summarizing research showing risks of severe COVID-19 associated with asthma). Mr. Ortiz's asthma is not new, according to his PSR "[he] reported he has suffered from bronchial asthma since birth" and "was ill during high school . . . due to his asthma. PSR ¶¶ 48, 51. This court finds that Mr. Ortiz's asthma is sufficiently chronic to place him at higher risk of contracting a severe reaction from COVID-19.

The medical records also support Mr. Ortiz's claim of an "essential (primary)" hypertension diagnosis. *See e.g.,* Medical Records at 3, 9, 35. He is prescribed daily medication to treat the condition. Medical Records at 3. In considering defendants with hypertension, some district courts have found benign essential hypertension alone cannot support compassionate release. *United States v. Thomas*, 471 F. Supp. 3d 745, 749–50 (W.D. Va. 2020) ("During the pandemic, courts in this district and across the country have released individuals suffering from hypertension, but only when these individuals also suffered from other underlying medical conditions."); *United States v. Brown*, No. 3:13-14, 2020 WL 3511584, at *6 (E.D. Tenn. June 29, 2020) ("the CDC only identifies pulmonary hypertension, not essential hypertension, from which defendant suffers [ ], as increasing the risk for severe COVID-19 infection."). However, other courts, including this one, have granted release when defendant had hypertension that was not specifically identified as pulmonary hypertension. *See Richardson*, 2020 U.S. Dist. LEXIS 108043, at *8 ("Defendant's hypertension alone places him at significant risk of complications."); *United States v. Sanders*, No. 19-20288, 2020 U.S. Dist. LEXIS 67595, at *10 (E.D. Mich. Apr. 17, 2020) ("Several courts . . . have identified hypertension as an underlying medical condition that renders a prisoner higher-risk, weighing against continued detention during the COVID-19 pandemic."); *Terraciano*, 2020 WL 5878284, at *4 (collecting cases); *United States v. Tamasoa*, No. 2:15-0124, 2020 WL 6700416, at *3 (E.D. Cal. Nov. 13, 2020) (finding defendants "stage 1 hypertension" supported release). Since Mr. Ortiz's high BMI alone qualifies him for consideration under the compassionate release statute, his case is only

strengthened by his hypertension and asthma. Mr. Ortiz's health conditions are sufficient to find extraordinary and compelling reasons to reduce his sentence, and thus the court turns to the conditions at FCI Sheridan.

Over the course of the ongoing pandemic, federal courts have reached conflicting decisions about the risk of infection at FCI Sheridan. Some have denied motions for compassionate relief because the risk of infection appeared low at the time an order issued. *See, e.g.*, *Becerra*, 2021 WL 535432, at *7; *United States v. Black*, 13-0078, 2020 WL 5887640, at *3 (N.D. Ind. Oct. 5, 2020); *United States v. Wells*, 16-0007, 2020 WL 5118165, at *2 (W.D. Wash. Aug. 31, 2020); *United States v. Stanard*, 16-0320, 2020 WL 2219478, at *3–4 (W.D. Wash. May 7, 2020). Others have granted motions even when the number of reported infections at FCI Sheridan is low or even zero, pointing to the risk of rapidly spreading disease in the congregate living facilities that prisons are. *See, e.g.*, *United States v. Morris*, No. 99-0174, 2020 WL 4344945, at *3 (W.D. Wash. June 22, 2020); *United States v. Moore*, 466 F. Supp. 3d 1148, 1150–51 (D. Or. 2020); *United States v. Etzel*, No. 17-00001, 466 F. Supp. 3d 1135, 1139 (D. Or. 2020). At one point last year, this court found the conditions at FCI Sheridan posed sufficient risk to support a finding that the circumstances were extraordinary and compelling. *See United States v. Sharma*, 15-00051, 2020 WL 6802404, at *4 (E.D. Cal. Nov. 19, 2020) (citing concerns that low number of COVID-19 cases might reflect limited testing, not absence of virus; collecting district court cases expressing same concern). FCI Sheridan then suffered an outbreak in December with infections rising to forty cases, after the number of reported cases had been zero as recently as two months before. *See Black*, 2020 WL 5887640, at *3; Mot. at 5–9 (noting rapid spike from 4 cases on Dec. 4, 2020 to 40 cases on Dec. 30, 2020).

Since December, a report referenced by the defense suggests "the situation at FCI Sheridan . . . has stabilize[d] following a sharp increase" in confirmed active COVID-19 cases. *See* Joint Status Rep. ¶ 1.a, *Stirling v. Salazar*, No. 20-712 (D. Or. Feb. 5, 2021), ECF No. 62.[6]

---

[6] The court may take judicial notice of public records such as these. *See* Fed. R. Evid. 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). The court also concludes that the contents of these reports is undisputed; Mr. Ortiz relies on them without opposition or objection by the government. *See* Mot. at 10.

8

1 More recently, five staff members and 1 inmate are reported as positive for COVID-19 within the
2 prison, and FCI Sheridan shows seventy people have recovered.  Bureau of Prisons, *COVID-19*
3 *Cases* (last visited March 11, 2020).[7]  Mr. Ortiz points out that testing for the virus is voluntary,
4 meaning the number of reported cases may represent an undercount of those actually infected.
5 Withycombe Decl. at 14–16, ECF No. 274-1 (averring "COVID tests are voluntary").  Given the
6 potential for undercounting COVID-19 cases and the ever-fluctuating numbers, given the current
7 record, this court cannot say the virus is sufficiently suppressed and will not return to FCI
8 Sheridan.

  Mr. Ortiz argues the uncertain conditions at FCI Sheridan pose a particular challenge in
light of his health status, given that he is unable to engage in the "self-care" needed to protect
himself against COVID-19.  Mot. at 1, 5–8, 19–23; *see* U.S.S.G. § 1B1.13 Application Notes
(providing reduction in sentence warranted if defendant "suffering from a serious physical or
medical condition" that "substantially diminishes the ability of the defendant to provide self-care
within the environment of a correctional facility and from which he or she is not expected to
recover.").  Mr. Ortiz provides extensive information, mostly unrebutted by the government,
regarding unsanitary conditions at FCI Sheridan.  Specifically, he says inmates are given "no free
soap to wash hands," only limited or broken masks, and at times there are "three people to a cell,
one person on the floor two feet from the toilet." Withycombe Decl. at 12–13, ECF No. 274-1.
Mr. Ortiz's inability to care for himself weighs in his favor on this motion.

  Finally, the relatively recent availability of vaccines also affects the public health
landscape in the federal prisons, including FCI Sheridan.  The government represents that, at the
time it filed its opposition, BOP had administered the vaccine to "85 staff members and 24
inmates" at FCI Sheridan.  Opp'n at 6; *see also* Bureau of Prisons, *COVID-19 Vaccine*
*Implementation* (reporting current numbers of 153 staff members vaccinated and 147 incarcerated
people vaccinated).[8]  The government does not provide a schedule for additional vaccination
rounds, or say when Mr. Ortiz is likely to be vaccinated.  The government does refer to

---

[7] *https://www.bop.gov/coronavirus/*.
[8] *Id.*

9

"Operation Warp Speed" which is a program intended to get more vaccinations to BOP facilities. Opp'n at 5. However, the program specifically states it prioritizes full-time staff over incarcerated people without providing any concrete projections. *Id.*

In sum, Mr. Ortiz has carried his burden in demonstrating that his medical conditions and the environment at FCI Sheridan create extraordinary and compelling reasons for his release. Thus, the court turns to the other portion of the required analysis.

**B.     Section 3553(a) Sentencing Factors**

Even though Mr. Ortiz has established he faces a high risk of severe symptoms if he contracts COVID-19, he is not automatically entitled to relief under § 3582(c)(1)(A). As summarized above, before a motion for compassionate release can be granted, the court must also be satisfied (1) that the requested reduction would not conflict with the factors listed in 18 U.S.C. § 3553(a) and (2) that release would not put the community at risk.

The government argues the § 3553 sentencing factors weigh against Mr. Ortiz because of the "nature and circumstance" of his offense. The government focuses on the factual basis underlying Mr. Ortiz's conviction following his guilty plea, Opp'n at 13, and the shipping of large quantities of methamphetamine across state lines is without question a serious offense. Additionally, the government argues that Mr. Ortiz "participated in unlicensed dealings of firearms," *id.;* although the government dismissed firearms charges against him, Mr. Ortiz agreed the court could consider facts underlying those charges at sentencing, Plea Agreement at 2. The facts to which Mr. Ortiz admitted were allowing his home to be used by his co-defendants for the unlawful sale of firearms to an undercover law enforcement agent. Plea Agreement at 14 (Factual Basis at A-3). This conduct is in fact serious; at the same time it does not reflect attributes of dangerousness, as discussed in a codefendant's case, *United States v. Tamasoa*, No. 2:15-0124, 2020 WL 6700416, at *5 (E.D. Cal. Nov. 13, 2020) (granting compassionate release to Mr. Ortiz's co-defendant who pled guilty to firearms charge and drug charge, suffered from eligible health conditions and did not pose danger to community). While arguing that Mr. Ortiz is overall more culpable than his codefendant, the government concedes his modest prior criminal history.

/////

1   Opp'n at 12; PSR at 9.  Mr. Ortiz's modest criminal history also supports a conclusion that he

2   will not pose a danger to the community if his sentence is reduced to time served.

3         Given the seriousness of Mr. Ortiz's offense the government argues he has not served

4   sufficient time on his custodial sentence.  Opp'n at 13.  The length of Mr. Ortiz's sentence is a

5   factor this court considers in assessing the appropriateness of release, and is not dispositive.

6   Using the government's more conservative estimate of Mr. Ortiz's percentage served of his

7   sentence, this court and others have granted compassionate release to defendants serving less time

8   overall.  *Terraciano*, 2020 WL 5878284, at *5 (collecting cases of courts' granting compassionate

9   release to defendants who served less than 30 percent of sentence imposed).

10         Ultimately, the question is whether Mr. Ortiz has a release plan that addresses the risks he

11   poses to the community if released early.  His detailed plan does support his request.  Mr. Ortiz

12   plans to live with his daughter's grandmother, Phyllis Moore, and his ailing father, Bill Ortiz.

13   The home is a 3-bedroom 2-bathroom home, which will provide him the ability to quarantine

14   upon arrival so he can protect his family members.  Mot. at 9.  He will reapply through Covered

15   California to receive treatment for his medical conditions, as he did with Kaiser prior to his

16   incarceration.  *Id.* at 9–10.  He has identified employment through his daughter's mother, who

17   will employ him at a furniture store.  *Id.* at 10.  He also will assist with his father's care.  *Id*. at 11.

18   The Federal Defender's Office will provide ongoing support through its established social work

19   team.  *Id.* at 11. The court has conferred with the Probation Office, which will arrange for

20   supervision following release, and it has assessed Mr. Ortiz's proposed residence plan as

21   appropriate for supervision.

22   **IV.   CONCLUSION**

23         The motion for compassionate release, ECF No. 274, is **granted.**

24         The court modifies Mr. Ortiz's sentence of incarceration of 120 months to time served.

25   All previously-imposed conditions of supervised release remain in effect.

26         There being a verified residence and an appropriate release plan in place, this order is

27   stayed for up to seven days for Mr. Ortiz to make appropriate travel arrangements and for BOP to

28   ensure the defendant's safe release. The defendant shall be released as soon as appropriate travel

arrangements are made and it is safe for the defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than seven days are needed to make appropriate travel arrangements and ensure the defendant's safe release, then the parties shall immediately notify the court and show cause why the stay should be extended.

The court ORDERS Mr. Ortiz to self-isolate for fourteen days in the residence of Phyllis Moore upon arrival, as a means of protecting his health and that of the others residing in the home. He must also comply with all applicable public health orders.

The requests to file under seal, ECF Nos. 275 & 285 are **granted.**

This order resolves ECF Nos. 274, 275, 285.

IT IS SO ORDERED.

DATED: March 19, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE